# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| STEPHEN KEITH POWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV412-004 |
| | ) | |
| INVESTIGATOR JEREMY SCOTT, | ) | |
| SHERIFF JIMMIE MCDUFFIE, | ) | |
| POLICE CHIEF MIKE BOHANON, | ) | |
| CITY OF RINCON, INVESTIGATOR | ) | |
| DAVID EHSANIPOOR, and | ) | |
| INVESTIGATOR MASON | ) | |
| GALLOWAY, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Following his arrest on suspicion of drug trafficking and the ultimate dismissal of those charges, plaintiff Stephen Keith Powell commenced this civil rights action alleging false arrest and malicious prosecution, the use of excessive force by the arresting officers, denial of medical treatment for injuries sustained at the time of his arrest, and the improper confiscation of money found on his person.   Doc. 1-1

(Complaint).[1]  All but one of the defendants move for summary judgment pursuant to Fed. R. Civ. P. 56.  Doc. 42.  The remaining defendant, Mason Galloway, moves to dismiss the case against him under Fed. R. Civ. P. 12(b)(6).  Doc. 56.

## I.    BACKGROUND[2]

On June 4, 2010, Effingham County Deputy Sheriff Jeremy Scott arranged to have a confidential informant purchase drugs inside the El Real restaurant in Rincon, Georgia from an individual identified by the informant as "KP."  Doc. 42-2 (defs.' Statement of Disputed Material Facts); doc. 43-1 (Scott aff.) ¶ 3.  Scott furnished the informant with drug unit funds and observed him enter the restaurant, emerge soon after with "KP," and conduct an apparent drug transaction beside the informant's vehicle.  Doc. 43-1 ¶ 3.  The informant then surrendered the narcotics that he had purchased from "KP" to the investigators.  *Id*.  Powell does

---

[1] Powell filed his complaint in the Superior Court of Effingham County. Defendants subsequently removed the action to this Court.  Doc. 1.

[2] Unless otherwise noted, the facts are undisputed.  The Court will highlight any differences in the parties' account of the facts and, in resolving the summary judgment motion, will accept plaintiff's version of the events where properly supported by his sworn statement.

not specifically refute defendants' version of these events, although he effectively denies that he was "KP" by claiming, under penalty of perjury, that he went to the restaurant solely to purchase lunch and that he "did not meet anybody" at the restaurant or speak to anyone other than the restaurant staff. Doc. 48 (plf.'s declar.) ¶ 3; doc. 51 (plf.'s Stmt. of Disputed Material Facts) ¶ 1. Accepting Powell's assertion that he did not engage in a drug transaction at the restaurant does not necessarily conflict with defendants' showing that, based on his investigation and personal observations, Deputy Scott *believed* that Powell was the person who had sold drugs to the informant.

Upon Powell's departure from the restaurant, Deputy Scott radioed to other police units for assistance in stopping and arresting him. Scott's vehicle and three other law enforcement vehicles, all with blue lights and sirens activated, then fell in behind Powell's vehicle. Doc. 43-1 ¶¶ 4-5. A dash-mounted camera on a marked patrol unit captured the pursuit on video. Doc. 42-2 ¶ F; doc. 61-1 (arrest video). That video reflects that several cars pulled to the side of the road in deference to the police pursuit while Powell continued to proceed and did not stop until he was

boxed in by a police vehicle. Powell declares that he "pulled over as soon as [he] noticed [the] Blue Lights." Doc. 48 at 1. At the summary judgment stage, the Court must credit that statement. But it is also entitled to credit defendants' unrebutted evidence that the pursuing officers all *believed* that plaintiff knew that he was being followed by a string of police vehicles with blue lights and sirens activated and, given his failure to pull over as other motorists were doing, that he likely was searching for a place to abandon his vehicle and flee on foot. Doc. 43-1 ¶ 6; doc. 43-3 (Ehsanipoor aff.) ¶ 4; doc. 43-4 (Bohannon aff.) ¶ 4. These are neither inconsistent nor mutually exclusive findings, for it is possible (however unlikely) for a motorist to fail to notice the flashing blue lights and sirens of pursuing police vehicles and, at the same time, for the police to conclude that the motorist is willfully disregarding their signals to stop and endeavoring to escape.

After a police vehicle blocked Powell's lane of travel, several other police vehicles involved in the pursuit stopped close to the side and directly behind Powell's car. Doc. 43-1 ¶ 7; doc. 43-3 ¶ 5; doc. 43-4 ¶ 5. As the video reflects, Deputy Ehsanipoor approached Powell's vehicle with

his sidearm drawn and began to shout instructions at Powell.[3] Other deputies on scene (including Mason Galloway and David Pollett) assisted Ehsanipoor as Deputy Scott remained in his vehicle. The evidence is in dispute as to whether Powell complied with the officers' verbal commands and submitted to their authority: Powell asserts that he *did*, doc. 49 ¶¶ 4, 8 (denying that he ignored the officers' commands or resisted arrest), while defendants assert that he *did not*. Doc. 42-2 ¶ P; doc. 43-3 ¶ 6 (according to Ehsanipoor, Powell "was non-compliant and argued with the various law enforcement officers on the scene" and offered "mild resistance"); doc. 43-4 ¶ 6 (according to Bohannon, Powell "was non-compliant, argumentative, and physically resisting"). While the video did not capture these events, the audio microphone worn by one of the officers recorded some of the words exchanged, though it is difficult to discern exactly what Powell was saying in response to the officers' rather forceful commands. Since that recording does not conclusively establish

---

[3] The video camera was in the patrol car that pulled to the side of Powell's vehicle. While the camera continued to record after the stop, because of the patrol car's position the camera failed to depict what transpired at the driver's door of Powell's vehicle. Thus, there is no video of Powell's takedown by the officers, although an audio microphone worn by one of the officers continued to record.

that Powell was arguing with the officers (rather than simply trying to explain why he had not immediately pulled over) or resisting, the Court must accept Powell's representation that he complied with the officers' verbal commands and did not resist their efforts to remove him from his vehicle and place him on the ground for handcuffing.

Defendants state that the officers "extracted Plaintiff from his vehicle using proper techniques to secure a suspect, and placed him on the ground." Doc. 43-3 ¶ 6; doc. 43-4 ¶ 6. They deny ever striking Powell and assert that only "minimal force" was needed to "gain control of Plaintiff and place him in handcuffs." Doc. 43-3 ¶ 7; doc. 43-4 ¶ 7. Powell does not specifically refute these assertions, but he does offer a more vivid account of his arrest, using descriptors that call into question defendants' assertion that only minimal force was utilized. Powell states that while he had his hands up three officers "crowded into [his] car" and attempted to "drag" him out of the vehicle but were hindered by the still-fastened seat belt. Doc. 49 ¶ 7. After releasing the belt, the officers "lifted" him out of the car and then "slammed" him "face first" onto the pavement in such a manner that he slid under the patrol car parked next to his

vehicle. *Id.* The officers then "'jumped' on his back" to apply handcuffs, and in the process his arm was burned when it came into contact with the patrol car's exhaust pipe. *Id.* The Court must credit plaintiff's declaration and decide whether, under this version of the events, defendants are entitled to judgment as a matter of law.

The parties dispute whether Powell complained of receiving any injury following his arrest. Defendants state that they do not recollect any such complaints. Doc. 43-1 ¶ 10; doc. 43-3 ¶ 9; doc. 43-4 ¶ 8. Powell, on the other hand, states that he "complained my arm was hurting, but Defendant Scott refused to respond" as he placed him in a patrol car.[4] Doc. 49 ¶ 12. Later on, after his arm pain increased, Powell says that he

---

[4] Defendants point to an inconsistency between statements Powell made in an affidavit furnished during discovery, doc. 43-6 (where he notes that it was after he arrived at the jail that he "first realize(d) the pain on [his] arm was a burn and the severity of [his] injury," and his sworn declaration in response to defendants' summary judgment motion, doc. 49 ¶¶ 7, 12 (where Powell states that he "screamed [his] arm was being burned by the police car tail pipe" and complained to defendant Scott that his arm was hurting). In his Statement of Disputed Material Facts, plaintiff further states that the video furnished by defendants during discovery conclusively establishes that he did in fact scream when his arm came in contact with the exhaust pipe and that the defendant officers involved in his arrest recognized that he had been burned. Doc. 51 ¶ 5. The Court has reviewed that recording and finds that the audio portion does offer support for plaintiff's assertion that one of the officers commented that Powell had sustained a burn to his arm.

asked Scott for medical care but Scott ignored him and directed that he be transported to jail.

During a post-arrest search, officers found that Powell was carrying $1,100 in cash, though the parties differ as to whether that search occurred at the roadside (Powell's view) or later at the jail (defendant's view). A search at the jail also revealed some powder cocaine concealed in Powell's sock. Doc. 42-2 ¶ HH. The police retained the money in their custody on suspicion that it included the $100 used by the informant to purchase drugs from Powell and that the balance constituted the illicit proceeds of other drug sales. *Id*. at II. Defendants contend that Powell made no attempt to reclaim the confiscated funds until the filing of this lawsuit (some two years later), when the money was returned to him upon his request. *Id*. at MM-PP. Powell states that he unsuccessfully sought the return of his funds immediately after making bail, though he concedes that the funds were returned to him upon the filing of this lawsuit. Doc. 49 ¶¶ 21, 23-24.

Upon his arrival at the jail, Powell states that he complained to both the officer who searched him and the booking officer (neither of whom are

defendants in this case) that he was experiencing severe pain from the burn on his arm. Doc. 49 ¶¶ 14-15. He claims that these officers refused to get him any medical attention for his burn. *Id.* at ¶¶ 14, 16. Not until 7 hours later, after the booking process was completed, did he finally see a nurse (also not a defendant). *Id.* at ¶ 17. He states that the nurse failed to clean his injuries or give him any medication, though he acknowledges that she did wrap his burn. *Id.* at ¶ 17. Plaintiff secured his release on bail the morning after he was arrested. *Id.* ¶ 18. The next day, June 6, 2010, he went to a hospital where he received a tetanus shot and pain medication. *Id.* at ¶ 19. On June 7, 2010, Powell states that he saw a physician who diagnosed his injury "as a 2nd degree burn."[5] *Id.* at ¶ 20.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is

---

[5] Powell states in his complaint that he sustained a "3rd degree" burn, doc. 1-1 at 19, and the record contains a medical record that describes the injury as a "third degree burn." Doc. 52-1 at 37.

"material" if it could affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence is such that a reasonable jury could decide in the non-moving party's favor. *Id*. at 248 (noting that the test for determining whether a genuine issue of material fact exists is the same as the test for granting a directed verdict). The Court must view the evidence and all reasonable inferences from that evidence in the light most favorable to the non-moving party. When the non-moving party has the burden of proof at trial, the party seeking summary judgment must either negate an essential element of the non-moving party's case or show an absence of evidence as to a fact necessary to prove the non-moving party's case. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 607-08 (11th Cir. 1991). In the face of a properly supported summary judgment motion, therefore, the non-moving party must make a sufficient showing on each essential element of his case for which he has the burden of proof.

## III.  DISCUSSION

Defendants Scott, McDuffie, Bohannon, and Ehsanipoor move for summary judgment on the basis of qualified immunity as to Powell's §

1983 claims.[6]  Galloway moves to dismiss based upon Powell's delay in identifying and naming him as a defendant.

## A.    Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their *individual* capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which are reasonable person would have known.'" *Brown v. City of Huntsville*, 608 F.3d 724, 733 (11th Cir. 2010); *Pearson v. Callahan,* 555 U.S. 223, 244 (2009) ("The principles of qualified immunity shield an officer from personal liability when [he] reasonably believes that his . . . conduct complies with the law."). "Because qualified immunity is a defense not only from liability, but also from suit, it is important for a court to

---

[6] Defendants McDuffie, Scott, and Ehsanipoor also assert that they are immune from suit in their official capacities. Doc. 42-1 at 18. "Suits against an official in his or her official capacity are suits against the entity the individual represents." *Parker v. Williams*, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989). The sheriff and his deputies, in their official capacity, act as an arm of the state, and thus are protected from suits for damages under the Eleventh Amendment. *Rylee v. Chapman*, 316 F. App'x 901, 905 (11th Cir. 2009) (quoting *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003), and *Powell v. Barrett*, 496 F.3d 1288, 1304 (11th Cir. 2007)). Hence, to the extent Powell seeks damages from defendants in their official capacities, those claims are barred. *Cf. Hafer v. Melo*, 502 U.S. 21, 30-31 (1991) ("the Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983").

ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotes and citation omitted).

A law enforcement officer is entitled to qualified immunity if "an objectively reasonable officer in the same situation could have believed" that his conduct violated no clearly established constitutional right. *Brown*, 608 F.3d at 733. In making this assessment at the summary judgment stage, courts conduct a two-part inquiry: (1) whether the facts, construed in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Brown*, 608 F.3d at 734. If either element is lacking, then the defendant is entitled to qualified immunity. *Pearson*, 555 U.S. at 236-243 (abrogating strict sequential analysis mandated by *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

## B. False Arrest and Malicious Prosecution

Powell alleges that defendants subjected him to false arrest and malicious prosecution in violation of both his constitutional rights and

state tort law. Essentially, his claims rest upon the fact that the state ultimately dropped all charges and returned all funds seized at the time of his arrest.[7]

A § 1983 claim for false arrest derives from the constitutional right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless arrest made without probable cause violates the Fourth Amendment and forms the basis of a § 1983 claim for damages. *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996); *Max v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990); *Von Stein v. Bresher*, 904 F.2d 572, 578 (11th Cir. 1990).[8] The existence of probable cause, however, is an absolute bar to both an action for false arrest and for

---

[7] The District Attorney dropped the charges "for reasons of judicial economy," as Powell was already serving a 10-year state sentence on drug trafficking charges. Doc. 52-1 at 67.

[8] State tort law also furnishes a cause of action for wrongful arrest, false imprisonment, and malicious prosecution. O.C.G.A. § 51-7-1 (right of action exists for "an arrest under process of law, when made maliciously"); O.C.G.A. § 51-7-20 (defining "false imprisonment" as "the unlawful detention of the person of another . . . "); O.C.G.A. § 51-7-40 (right of action exists for "[a] criminal prosecution which is carried on maliciously and without any probable cause . . .").

malicious prosecution.[9]  *Brown*, 608 F.3d 734; *Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009).  "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that the criminal offense has been or is being committed."  *Brown*, 608 F.3d at 734.  Even where actual probable cause is lacking, an officer is entitled to qualified immunity upon a showing of "arguable" probable cause, which exists "where a reasonable officer in the same circumstances and possessing the same knowledge as the "[defendant officers] *could have believed* that probable cause existed to arrest."  *Lee*, 284 F.3d at 1195 (emphasis added).

The undisputed facts establish that the defendant officers unquestionably had probable cause to arrest and prosecute Powell for dealing in drugs.  Powell does not contradict defendants' showing that Deputy Scott arranged and personally observed a drug buy from a person

---

[9] False arrest, a "species" of false imprisonment, arises from detention without legal process.  *Wallace v. Kato*, 549 U.S. 384, 389 (2009).  Once legal process issues, a claim of false arrest or imprisonment is transformed into "the entirely distinct" tort of malicious prosecution.  *Id.* at 390.

that he then believed (and that defendants *still* believe) to be Powell.

Powell now says that he was actually innocent of any wrongdoing, and he

points to the dismissal of the charges as proof of his innocence. But the

existence of probable cause is not defeated by the fact that the suspect is

ultimately proven to be innocent of the crime for which he was arrested

or charged. "'Indeed, it is inevitable that law enforcement officials will in

some cases reasonably but mistakenly conclude that probable cause is

present, and in such cases those officials should not be held personally

liable." *Brown*, 608 F.3d at 734-35 (quoting *Von Stein v. Bresher*, 904

F.2d 572, 579 (11th Cir. 1990)); *see Mehta v. Foskey*, 2013 WL 1808764

(S.D. Ga. Apr. 29, 2013) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1435,

1436 (11th Cir. 1998), which explained that an "arresting officer need

conduct only a reasonable investigation to establish probable cause" and

need not pursue every investigative lead in order to "eliminate the

possibility of conviction of an innocent man."). Nor is there any evidence

in the record suggesting that the probable cause that led to Powell's

arrest dissipated prior to the commencement of formal legal proceedings.

As there was actual, not merely arguable, probable cause to support both Powell's arrest and prosecution, his false arrest, false imprisonment, and malicious prosecution claims cannot survive defendants' motion for summary judgment.[10]

## C.    Excessive Force

Powell's complaint alleges that the defendant officers used a "disproportionate amount of force" in effecting his arrest.  Doc. 1-1 ¶¶ 19 (Scott), 21 (Ehsanipoor), 22 (John Doe), 23 (Bohannon).  He asserts that the officers' conduct violated the Fourth Amendment[11] and constituted an "assault and battery" under state tort law.  *Id.* at ¶ 40.  The summary judgment defendants contend that they are entitled to qualified immunity because, under the particular circumstances presented by this case, a reasonable officer could have concluded that the amount of force

---

[10] His claim that he was illegally searched also fails.  Because the agents had probable cause to arrest Powell, the search of his person was lawful as a search incident to arrest.  *E.g.*, *United States v. Goddard*, 312 F.3d 1360, 1362-64 (11th Cir. 2002).

[11] While Powell invokes a number of constitutional provision, the law is clear that a § 1983 excessive force claim under these circumstances arises solely under the Fourth Amendment.  *Graham v. O'Connor*, 490 U.S. 386, 395 (1989); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

employed was reasonable and appropriate. Doc. 42-1 at 10-14. As some of the facts surrounding the officers' use of force are in dispute, the Court must accept Powell's version of any disputed facts and view those facts in the light most favorable to him in assessing whether defendants are entitled to qualified immunity. *Lee*, 284 F.3d at 1191 n. 1.

The constitutional protection against unreasonable searches and seizures "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Id*. at 1197. Nevertheless, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or the threat thereof to effect it." *Graham*, 490 U.S. at 396. Determining whether the use of force is reasonable "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Lee*, 284 F.3d at 1197 (quoting *Graham*, 490 U.S. at 396). A number of factors should be considered in determining whether the force used is "reasonably proportionate to the need for that force," *id*. at 1198, "including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Brown*, 608 F.3d at 738; *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002); *Lee*, 284 F.3d at 1197-98.  In this circuit, a further consideration is "the extent of the injury inflicted" as a result of the use of force.  *Lee*, 284 F.3d at 1198 & n. 7 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)).

"A law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive." *Brown*, 608 F.3d at 738.  The inquiry is purely an objective one, and thus an officer's subjective good or bad intentions are not to be considered. *Graham*, 490 U.S. at 397-99; *Brown*, 608 F.3d at 738; *Lee*, 284 F.3d at 1198 n. 7.  The plaintiff bears the burden of establishing "that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194.

The officers in this case arrested an individual whom they reasonably believed had just sold cocaine to an informant.  Deputy Scott

avers that he set up the controlled buy and personally observed the informant purchase cocaine from a person believed to be Powell. While Powell protests his innocence, he never refutes the particulars of Scott's sworn statement. Nor does he contest the defendants' sworn statements that, at least from their perspective, Powell *appeared* to ignore the cavalcade of law enforcement vehicles with blue lights flashing and sirens blaring (even if, as he claims, he was distracted by eating and listening to loud music and never noticed the police). It is also undisputed that Powell stopped his vehicle only when boxed in by the police. While there is nothing in the record to reflect that the officers had specific information that Powell was armed, courts have long recognized that guns are "tools of the drug trade." *United States v. Rodriguez*, 765 F.2d 1546, 1562 (11th Cir. 1985); *United States v. Montes-Cardenas*, 746 F.2d 771, 776- 77 (11th Cir. 1984); *United States v. Wooten*, 253 F. App'x 854, 857 (11th Cir. 2007). Because of the "inherent danger" associated with drug arrests, the police are entitled to use "intrusive tactics" when taking a drug suspect into custody. *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005).

"*Graham* establishes generally that more force is appropriate for a more serious offense and less force is appropriate for a less serious one . . . ." *Lee*, 284 F.2d at 1198. Here, the officers were endeavoring to stop and arrest a person believed to have just sold narcotics,[12] and they were entitled to the inference that Powell might be armed and dangerous. Thus, the threat level was high for that reason alone. The officers were also confronted with a drug suspect who they reasonably believed was attempting to avoid capture, as he did not respond to the blue lights and sirens that other motorists had respected. This behavior only served to enhance the officers' concerns that Powell might pose a risk to their safety or the community generally. Under these circumstances, all of the *Graham* factors -- severity of the crime, threat to officer safety, and a perceived effort to evade arrest -- strongly favor the defendants.

---

[12] It is instructive to compare the seriousness of the crime at issue here with those cases where the minor nature of the offense warranted a finding of that law enforcement officers had used excessive force. *See, e.g., Brown*, 608 F.3d 724 (denying qualified immunity to officer who pepper sprayed, and then slammed into the ground, an arrestee suspected only of playing music too loud); *see also Lee*, 284 F.3d 1188 (denying qualified immunity to officer who arrested plaintiff for honking her horn and then slammed her head onto trunk of car after she was secured in handcuffs).

The Court must credit as true Powell's statement that once he came to a stop and was approached by the officers he complied with their commands, put his hands in the air, and offered no resistance as they removed him from his vehicle. Given the nature of the crime under investigation and Powell's behavior during the police pursuit, however, the officers' safety concerns did not evaporate at this point. Those who appear to surrender and submit to arrest sometimes feign compliance or have a last second change of heart. Under the particular circumstances of this case, the officers were not required to relax their guard and assume that Powell no longer posed a danger or risk of flight. *See Lee*, 284 F.3d at 1200 (in making split-second judgments as to the amount of force needed to subdue and secure a suspect, officers "'are not required to err on the side of caution,'" and thus defendants are entitled to qualified immunity in "close cases"). Until Powell was actually secured, the officers were entitled to infer that he might produce a hidden weapon, strike an officer, or endeavor to ram a police vehicle and continue his flight. Thus, the police were perfectly justified in forcibly entering Powell's car, physically removing him from the vehicle, and immediately

placing him face down on the ground before administering handcuffs. Such vigorous takedown measures are routinely employed by law enforcement officers when dealing with drug traffickers or other serious offenders who attempt to evade capture.[13]

While Powell states that the officers "slammed" him to the ground "face first," he neither alleges in his complaint nor offers any evidence that he suffered any facial injuries (broken nose, cracked teeth, gash to the forehead, etc.) as a result of being forced to the ground. "[T]he extent of the injury inflicted" is a factor the Court may take into consideration in gauging whether the amount of force used was reasonable under the circumstances. *Lee*, 284 F.3d at 1198 & n. 7. The fact that Powell

---

[13] A very different result obtains where officers gratuitously use force on a suspect who has already been subdued and handcuffed, for in such situations even the use of otherwise de minimis force is objectionable. *Compare Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (officer's use of de minimis force in pulling cameraman to the ground and pinning his arms behind his back for handcuffing would not support excessive force claim, as such force was applied in effecting a lawful arrest), *with Lee*, 284 F.3d at 1191, 1198–99 (denying qualified immunity and finding the level of force used against the plaintiff to be excessive where the plaintiff had already been handcuffed when officers slammed her into a car), *and Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (excessive force found where office released an attack dog on the plaintiff after the plaintiff had already been forced to lie on the ground and while the officer pointed his gun at the plaintiff's head). Here, like in *Durruthy*, the force was applied while the officers were in the act of restraining Powell, *not* after he was restrained.

describes no serious injury as a result of being "slammed . . . face first" to the ground suggests that the amount of force used by the officers was not disproportionate to their need to gain immediate physical control over a potentially dangerous suspect.

It is undisputed that Powell suffered a severe burn during the course of his arrest when his arm made contact with a hot exhaust pipe of a police vehicle. Powell states that the burn occurred because the officers used such force when putting him to the ground that he "actually 'slid' under the Rincon Police Car next to his vehicle." Doc. 49 ¶ 7; doc. 51 ¶ 4. In his opposition to defendants' summary judgment motion, however, Powell never avers that the officers intentionally caused his arm to come into contact with the exhaust pipe.

"For even *minor* offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls." *Brown*, 608 F.3d at 740 (emphasis added); *Durruthy*, 351 F.3d at 1094 (police may use de minimis force (such as forcing the suspect to the ground) when making a custodial arrest "regardless of the severity of the alleged offense" and even if the force applied was "unnecessary"). And where, as here, even

more aggressive takedown measures are justified, the fact that the arrestee suffers a physical injury as a result of being slammed to the ground or thrown about does not deprive the officer of qualified immunity. *See, e.g., Rubio v. Lopez*, 445 F. App'x 170, 173 (11th Cir. 2011) (qualified immunity shielded officer who pushed civil rights plaintiff onto hot pavement, even though plaintiff screamed out that he was being burned and suffered second degree burns to his face and chest); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351-53 (11th Cir. 2002) (officer entitled to qualified immunity despite fact that injuries caused by twisting and jerking plaintiff's arm when applying handcuffs necessitated 25 surgeries and the eventual amputation of plaintiff's arm below the elbow); *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) (officer enjoyed qualified immunity despite plaintiff's multiple bruises from being thrown into van, kneed in the back, and having his head pushed against van); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (affording officer qualified immunity from claim that he slammed suspect against wall and kicked his legs apart, even though plaintiff required treatment for resulting pain to his arthritic knee); *see also Gold v. City of*

*Miami*, 121 F.3d 1442, 1446-47 (11th Cir. 1997) (affording officer qualified immunity on claim that he applied handcuffs too tightly for 20 minutes, causing pain and skin abrasions); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir. 1993) (officer arresting restaurant manager for violating ordinance enjoyed qualified immunity from claim that he needlessly placed plaintiff in chokehold and pushed him against wall).

Accepting Powell's version of the disputed facts, he has failed to show that the officers' judgment as to the amount of force needed under the circumstances was so flawed that no reasonable officer could have believed that the application of force met constitutional standards. *Brown*, 608 F.3d at 738 (plaintiff must show that no "objectively reasonable officer in the same situation could have believed that use of force was not excessive."). Accordingly, qualified immunity provides defendants with complete protection from Powell's excessive force claim.[14]

---

[14] To the extent he faults Chief Bohannon for the takedown procedure used, doc. 1-1 at 14, the claim fails. A § 1983 plaintiff must offer facts showing some sort of causal connection between a supervisory official's actions and the claims put forward in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978);

## D. Medical Claims

Powell alleges that the arresting officers failed to obtain prompt treatment for the burn to his arm, causing him unnecessary pain and suffering. Doc. 1-1 ¶¶ 19 (Scott), 21 (Ehsanipoor), 22 (John Doe), 23 (Bohannon). While defendants aver that they do not "recall" Powell ever complaining about his burn injury, the Court must credit Powell's contrary declaration that the officers knew that he had suffered a severe burn, heard him complain about the pain from that injury, but directed that he be transported to jail rather than taking other (never specified) measures to ensure that he received proper medical care. Doc. 49 ¶¶ 12, 13; doc. 51 ¶ 18.[15]

---

*Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Powell has not offered any facts suggesting that the Chief was deliberately indifferent to his rights in the way he managed his subordinates. *Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1541-42 (11th Cir. 1994) (Kravitch, J., concurring) (plaintiff must show that the supervisor's knowledge amounted to deliberate indifference to the asserted harm or risk, in that his knowledge was "so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights."); *Weaver v. Toombs*, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd*, 915 F.2d 1574 (6th Cir. 1990); *see also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

[15] Defendants point out that during discovery Powell furnished an affidavit stating that it was not until he arrived at the jail that he "first realize[d] the pain on [his] arm was a burn and the severity of [his] injury." Doc. 43-6 at 2. Viewing the evidence in the light most favorable to Powell, the record would still support a finding that at least some of the arresting officers knew that he had sustained a burn

"To prevail on a claim of deliberate indifference to [a] serious medical need in violation of the Fourteenth Amendment, a plaintiff must show: '(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury.'" *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009)). Where, as here, the defendant is not a trained medical professional, "the need for immediate medical assistance must have been apparent to the untrained eye of a lay person." *Id.* at 564 n. 8. And as defendants have asserted the defense of qualified immunity, Powell bears the burden of showing that, under the specific factual context of this case, "[t]he unlawfulness of [defendants'] actions [was] truly obvious, rather than simply implied by the preexisting law." *Id.* at 563 (noting that "it is vital" that the qualified immunity inquiry "be undertaken in light of the specific context of the case, not as a broad general proposition") (citation omitted).

---

to his arm, that plaintiff complained at the arrest scene that his arm was hurting (even if he didn't know its cause), and that he requested medical attention.

Accepting his version of the disputed facts, Powell has not shown that it would have been obvious to an objectively reasonable police officer that having him transported to a jail with a medical staff, rather than summoning emergency medical assistance to the roadside or taking him to a hospital, "would certainly violate the Constitution." *Id*. at 564. The Eleventh Circuit has "explained that a successful constitutional claim for 'immediate or emergency medical attention' requires 'medical needs that are obvious even to a lay person because they involve life-threatening conditions or situations where it is apparent that the delay would detrimentally exacerbate the medical problem.'" *Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 511-12 (11th Cir. 2010) (quoting *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187-88 (11th Cir. 1994), abrogated on other grounds by *Hope v. Pelzer*, 536 U.S. 730 (2002)). "An arrestee 'who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'" *Id*. at 512 (quoting *Hill*, 40 F.3d at 1188)). Powell offers no such evidence.

It is undisputed that not long after arresting Powell and securing him in a police car, officers had him transported to a jail that had a medical staff. Plaintiff neither alleges, nor does the record suggest, that the officers knew that Powell had sustained a type of injury that the jail staff was ill-equipped to treat. Further, there is no allegation or evidence that the officers knew that it would have taken more time to have Powell's medical complaints evaluated at the jail than at a local hospital.[16] *See Youmans*, 626 F.3d 557 (4-hour delay in obtaining medical treatment for a detainee severely beaten by police incident to his arrest (following a vehicle chase) did not violate "clearly established" law, despite fact that plaintiff presented with multiple cuts and bruises, appeared disoriented at times, said he had blurred vision, and had blood on his person); *Andujar v. Rodriguez*, 486 F.3d 1199 (11th Cir. 2007) (applying temporary bandage to stop the bleeding from puncture wounds inflicted by a dog

---

[16] Clearly, calling for EMS personnel to come evaluate Powell's injury would have necessitated some delay, as would any transportation to a local hospital. Further, as anyone who has much experience with hospital emergency rooms can attest, those with non-life-threatening medical complaints often encounter considerable delay before receiving medical attention from ER staff. A reasonable officer in these circumstances, therefore, could not have been certain which facility -- jail or hospital -- would likely first attend to Powell's burn injury.

during plaintiff's arrest, but failing to ensure that plaintiff's wound was stitched up before he was booked at the police station, was acceptable for constitutional purposes); *Fernandez*, 397 F. App'x 507 (8-hour delay in providing arrestee with medical treatment sustained when officer "kicked him multiple times in his face . . . punched him in the head and ribs, and slammed his face into a vehicle's trunk," causing temporary "massive bleeding," pain, confusion, disorientation, and difficulty breathing, failed to survive defendant's claim to qualified immunity).

Powell alleges that upon his arrival at the jail both the intake officer and the booking officer ignored his complaints of pain and neglected to obtain prompt medical treatment for his burn injury. He also states that when he finally saw a nurse some seven hours later, the treatment he received was cursory and ineffectual. None of these jail officials, however, is named as a defendant in the case. Nor does Powell allege or show that the arresting officers were responsible for either the delay or ineffectiveness of his treatment by jail officials.[17]

---

[17] Powell does assert that the City of Rincon is responsible for his neglectful medical treatment at the jail. But as explained below, Powell's claim of municipal liability fails as a matter of law. He also suggests that Sheriff McDuffie is at fault for

### E.    Conversion

Powell argues that Scott stole $1,100 from him and refused to give it back until he filed suit. Doc. 1-1. Scott avers that the money was seized as evidence but was made available for his reclamation after the criminal case against him had been dismissed. Doc. 43-1 at 3. There is no federal claim here, as state law affords a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 531-33 (1984); *see* O.C.G.A. § 51-10-1 (providing a cause of action in tort for the wrongful deprivation of personal property).

### F.    Liability of the City

Powell sues the City of Rincon for setting polices which allowed the application of excessive force against him during his arrest.[18] While a city is a legal entity amenable to a § 1983 lawsuit, it may not be liable under §

---

the delay. Doc. 1-1 at 21. That claim fails for the same reasons explained in note 14, discussing vicarious liability as a basis for suit against Chief Bohanon.

[18] He cannot hold the City liable on the false arrest or malicious prosecution claims, as the officers acted with probable cause and therefore did nothing wrong in arresting and prosecuting him. Even if he offered facts suggesting the existence of a problematic policy (he hasn't), the mere existence of such a policy did not result in a deprivation of his constitutional rights on these facts.

1983 absent a showing that a custom, pattern, or practice of the city resulted in the deprivation of a plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Jones v. Lowndes County*, 678 F.3d 344, 349-50 (5th Cir. 2012); *Shelby v. City of Atlanta*, 578 F. Supp. 1368, 1370 (N.D. Ga. 1984). A city cannot be held vicariously liable for the actions of its officers or employees. *Monell*, 436 U.S. at 691. Here, Powell states that the City should be held responsible since it was on notice that Bohanon was a "loose cannon." Doc. 51 at 3. He states that there were twenty instances of misconduct and Bohanon was in fact fired because of his temper.[19] *Id.* The City denies those allegations, doc. 52-1 at 76, and Powell has not referenced any admissible evidence suggesting that the City was aware of or had condoned such behavior. *Id.* Since

---

[19] In an interrogatory to Bohannon, Powell cites a Savannah Morning News opinion piece stating that "[i]t appears. . . that Bohannon's reported temper and at times volatile dealings on the job, along with placing the city and his department at risk, were all his own doing and in the end too much to overcome." (Doc. 38-1 at 15); Bohannon's firing not a repeat performance, Savannah Morning News (April 2, 2012), *available at* http://savannahnow.com/effingham-now/2012-04-12/bohannons-firing-not-repeat-performance#.UVxgHpPCbTo (last visited July 31, 2013). Nothing in the article, which is otherwise hearsay, suggested any inappropriate behavior towards suspects. Instead, it points out that he was ousted for his refusal to conduct an internal investigation of one of his officers who was still involved in an ongoing investigation. *Id.*

Powell offers no evidence showing a custom, pattern, or practice linking the City to the allegations in his complaint, his claim against the City fails.

## IV.  MOTION TO DISMISS

Invoking  Fed. R. Civ. P. 12(b)(6), Mason Galloway moves to dismiss Powell's claims against him because they were untimely filed and therefore fail to state a claim for relief.  Doc. 56.  "If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim" *Jones v. Bock*, 549 U.S. 199, 215 (2007).

An action brought under 42 U.S.C. § 1983, or under Georgia law for personal injury claims, is barred if not brought within two years after the cause of action accrues.  *Mullinax v. McElhenney*, 817 F.2d 711, 715-16 n.2 (11th Cir. 1987); *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986) ("the proper limitations period for all section 1983 claims in Georgia is the two-year period set forth in O.C.G.A. § 9-3-33 for personal injuries.").  The conduct described in Powell's complaint occurred on

June 4, 2010.  Doc. 1-1.  Powell did not move to amend the pleadings to substitute Mason Galloway for the John Doe defendant until July 13, 2012, over a month outside the two-year limitations period.  Doc. 28.

Federal Rule of Civil Procedure 15(c)(1)(A) allows an amendment to a pleading to relate back to the date that the pleading was originally filed when the "law that provides the applicable statute of limitations allows relation back."[20]  Georgia provides the limitations period in this case. *Mullinax*, 817 F.2d at 715-16 n. 2; *see Wilson v. Garcia*, 471 U.S. 261, 268-69, 274-75 (1985) (holding that in § 1983 cases, the length of the limitations period and the closely related questions of its application and tolling are governed by state law).  In order for an amendment seeking to add a defendant to relate back under Georgia law, three elements must be met: (1) the claim must arise from the same facts and circumstances as the original claim; (2) the new party must have received sufficient notice

---

[20] Rule 15(c)(1)(A) "is intended to make it clear that the rule does not apply to preclude relation back that may be permitted under the applicable limitations law. Generally, the applicable limitations law will be state law. . . . Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim." Fed. R. Civ. P. 15 advisory committee notes.

of the suit prior to the running of the statute of limitations; and (3) the new party should have known that but for a mistake concerning the identity of the proper party, the suit would have been brought against him. *Matson v. Noble Inv. Group*, 288 Ga. App. 650, 653-55 (2007) (discussing O.C.G.A. § 9-11-15 and citing *Crane v. State Farm Ins., Co.*, 629 S.E.2d 424, 426 (2006)). There is no indication that Galloway received any notification of the suit prior to the expiration of the statute of limitations. Nor has Powell offered facts showing that Galloway was aware that the case would have been filed against him but for a mistake concerning his identity. Consequently, the amendment does not relate back under Georgia law.

Rule 15(c)(1)(C) similarly permits claims against a late-added party to relate back "if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *See Cliff v. Payco Gen. Am. Credits, Inc.*, 363

F.3d 1116, 1131 (11th Cir. 2004). The motion to amend was filed well outside the 120-day window provided by Rule 4(m). The addition of Galloway, therefore, did not relate back to the original filing of the complaint under Rule 15(c)(3).[21]

Despite granting Powell's motion to amend the complaint to name Galloway, it is clear that the amendment does not relate back to the date that the claim was filed. Hence, Galloway's motion to dismiss Powell's claims against him, doc. 56, must be granted.

## V.  CONCLUSION

All of Powell's federal claims fail to survive defendants' motion for summary judgment and motion to dismiss. Accordingly, the Court should

---

[21] Despite naming a John Doe defendant, the amendment still would not relate back to the time the original complaint was filed because plaintiff's lack of knowledge as to Galloway's name was not a "mistake concerning the proper party's identity," as required by Rule 15(c)(1)(C). *Wayne v. Jarvis*, 197 F.3d 1098, 1102-04 (11th Cir. 1999), *overruled on other grounds*, *Manders*, 338 F.3d at 1328-29.

Powell also contends that some of his claims against Galloway did not accrue until the dismissal of the criminal case against him in 2011. Doc. 59 at 3. Presumably, he is referring to his claim for malicious prosecution. Assuming he had made out sufficient allegations in the complaint to even tie Galloway to that claim, the Court previously explained that the existence of probable cause entirely undermined it. Thus, the issue is closed even if that portion of the claim was not subject to the two-year limitations period.

decline to exercise 28 U.S.C. § 1367(c) supplemental jurisdiction over the state claims he has peppered throughout his complaint.[22]  *Cf. Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) ("if the federal claims are dismissed prior to trial, [*United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)] strongly encourages or even requires dismissal of state claims"); *accord Granite State Outdoor Advertising, Inc. v. Cobb County, GA*, 193 F. App'x 900, 907 (11th Cir. 2006).  Since this case was removed from state court, the proper course is to remand those claims back to the appropriate court rather than dismissing them.  *Pace v. Peters*, ___ F. App'x ___, 2013 WL 3870280 (11th Cir. July 26, 2013); *see Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1226–27 (11th Cir. 2010) ("federal district courts in removal cases must remand, rather than dismiss, state claims over which they decline to exercise supplemental jurisdiction."); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1123 (11th Cir. 2005) ("Because this case was originally filed in state court and removed to federal court pursuant to 28 U.S.C. § 1441, if the district court declines

---

[22]  Under § 1367(c), the Court "may decline to exercise supplemental jurisdiction over a claim . . . if -- (3) [it] has dismissed all claims over which it has original jurisdiction".

to continue to exercise supplemental jurisdiction, [the] remaining claim should be remanded to state court."). For all of the reasons explained above, defendants' motion for summary judgment, doc. 42, and motion to dismiss Galloway, doc. 56, should be **GRANTED**, and this case should be **REMANDED** to the Superior Court of Effingham County, Georgia.

**SO REPORTED AND RECOMMENDED** this ___7th___ day of August, 2013.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA